The Chancellor.
I have no doubt of the power of the court to interpose in this case by injunction, nor of the propriety of its exercising that peculiar jurisdiction, if, as is alleged, the defendants, under and by virtue of the power of the legislature, conferred upon “ The Paterson and Hudson Eiver Eailroad Company ” to bridge the river Passaic, are obstructing the navigation of that river, in violation of the provisions of the act from which they derive their authority.
The location of the bridge in question is several miles below the head of navigation, where the tide ebbs and flows, and where the' river is navigable for sailing vessels of tons burthen, and for small steamboats.
The power of the legislature to grant the right of constructing the bridge is admitted. The only issue is, whether the defendants are exercising the right, within the limits prescribed by the legislature; and, if they are not, whether this court can and ought to interfere.
“ The Paterson and Hudson Eiver Eailroad Company ” is a creature of the legislature. If it is exercising its franchises in a manner not authorized by the law which gives it existence, and so as to destroy or impair the common rights of the citizens in this navigable river, it is the duty of this court — the only court of the state which can apply an adequate remedy for the mischief — to restrain the defendants in the commission of the injury.
On behalf of the defendants it is insisted that, if the construction in the river for the purpose of the bridge is not in conformity to the law, then it is a question of nuisance — a question which should be either referred to the *546 courts of common law or submitted to a jury, under the direction of this court, as a matter of fact.
If the ground upon which the interférence of the court is invoked depends upon facts, of dispute and doubt, involving the credit of witnesses conflicting in their testimony, the weight due to opposing opinions, and the exercise of a discriminating judgment as to facts and circumstances, and the opinions of witnesses, this court o.ught not, and especially in cases of magnitude, to conclude the rights of a party without the intervention of a jury.
In this case, the complainants have sought the jurisdiction of the court, and submitted to its decision the law and facts. As for the defendants, with the view I have taken of the facts, they require no other tribunal for their protection.
I shall decide the case upon the bill, with the affidavits accompanying it, and the affidavits read in reply, on behalf of the defendants. No question was made on the argument, as to the manner in which the case is presented on either side, and, in that respect, I am free from embarrassment.
The complainants allege that the defendants are about reconstructing their bridge over the Passaic river, near Acquackanonck; that, in doing so, they propose to alter the position of the draw in the present bridge, and to place under the same a new set of stone piers near the centre of the river — the draw to be placed between the said stone piers; that the piers are intended to be each from seven to eight feet broad, and of the width of the bridge, as the-same shall be ^widened, to the extent of several feet beyond that of the present bridge j that it is proposed to place the said piers diagonally across the river, and at right angles with the bridge, and not with the current of the stream; that these stone piers are substituted for the wooden piles heretofore used, and that placing the same in the position intended, will materially impede navigation, and not being in the line of the current of the river, must render extremely dangerous, if not impracticable, the navigation of *547 the river with vessels navigating the same. They deny the right of the defendants to place the stone piers in the river, or to build the bridge with the draw in the manner contemplated, on account of the same being unnecessary obstructions, not contemplated b'y the charter of “The Paterson and Hudson River Railroad Company.” The complainants pray that this court may decree that the defendants have no right to place the stone piers and draw in the river in the manner proposed, and that they may be enjoined from carrying out their plans as contemplated.
By the act incorporating “The Paterson and Hudson River Railroad Company,” passed the 21st day of January, 1831, it is enacted “that the company shall have the privilege and authority to erect, build and maintain, on the rivers Passaic and Hackensack, respectively, such wharves, piers, bridges and other facilities as they may think expedient and necessary for the full enjoyment of all the benefits conferred by their act of incorporation.” The dimensions of the draws, or the manner of constructing them in the bridges, are not prescribed by the act; but provision is made for keeping lighted lamps at the draws for the safety of vessels navigating the river.
By a supplement passed January 21st, 1831, the width of the draw in the bridge over the Haelcensach river is prescribed, with directions that it shall be placed in a line with the course of the river.
Under the provisions of these acts the company constructed their road from Paterson to the Hudson river, and in the years 1832 and 1833, erected bridges over the rivers Passaic and Hackensack. In the bridge over the Passaic they placed, near the western shore of the river, a draw, at right angles with the bridge, and twenty-six feet in width.
On the 10th of March, 1842, an act was passed, entitled “An act for the better protection of the navigation of the Passaic river,” by which it was enacted “that each and every bridge or viaduct, hereafter to be erected over the Passaic river between the head of navigation and the Newark bay, shall be so constructed as to contain a draw *548 for the free passage of vessels navigating the said river, the opening of which draw shall be at least thirty-five feet wide in the narrowest part, and shall be placed in such position as to do the least possible injury to the navigation thereof.”
This last act was repealed by an act of the 24th of February, 1843 ; but, at the same time, the act of 1842 was reenacted, with some additional provisions, not necessary, for our purpose, to mention.
The company widened their draw, in conformity to the requirements of this act, to thirty-five feet or more. Its position in the river, or as to the bridge, was not changed.
The draw now contemplated is to be forty-five feet in width. 1't is to be placed in the middle of the river, and, like the present draw, is to be at right angles to the bridge. The change of its position from the side to the middle of the river and bridge, is not objected to. The position proposed, it is admitted, is more advantageous than the old one. The water is deeper at the new location, and it obviates difficulties which vessels have had to encounter at the present draw, in consequence of its proximity to the shore.
But it is insisted that the contemplated draw should be placed in a line with the course of the river, and not diagonally to it; and that if it is not,' its position will not be such as is required by the law of 1843, “so as to do the least possible injury to the navigation thereof.”
It will be observed that the act does not, in terms, require the draw to be placed in a line with the course of the river. But if that position is the one to do the least possible injury to navigation, the draw must be so placed in order to answer the requirement of the last-mentioned act.
The language of the act differs from that of the act of the 21st of January, 1831, in reference to the bridge over the Hackensack, which requires, in terms, the bridge on the latter river to be placed “in a line with the course of the river.”
Is there such evidence before the court as proves, with any reasonable certainty, that the position of the draw, as contemplated, is not such as will do the least possible injury to *549 the navigation of the river, and such as will justify the court in interfering with the works of the defendants ?
The affidavit annexed to the bill is that of Zackariah Keasler, who swears that he is the captain of a vessel plying on the river, and that he has been engaged in boating on the Passaic for upwards of twenty years ; that he has examined the works in progress of erection for a draw; that the position of the draw being diagonal to the current, and not in the line of the stream, will make the passage of vessels through the said draw difficult and dangerous at most times; that in time of freshets, which are of frequent occurrence, and with certain winds, the passage will be impracticable, and that the draw should be on a line with the current and course of the river, and not at right angles to the bridge.
Thomas Pettit is the master of a schooner navigating the river. He testifies that the location of the draw being at right angles with the line of the bridge, and consequently crossways with the current and line of the river, will make the passage through it dangerous and hazardous at all times; and, under certain and frequent circumstances, such as freshets and certain winds, impracticable without sustaining serious damage; that the line of the draw should be in a line with the river and the current of the river. He adds, “ the fact of its present construction being placed as above stated, I consider the greatest obstruction to the navigation of the said river that could be conceived or imagined, and entirely unnecessary.”
Henry Crawford is master of a schooner navigating the river. His affidavit is very much in the language of Pettit’s, and corroborates his statements.
It is thus seen, that in the opinion of these witnesses, the position of the proposed draw is very far from being such “ as to do the least possible injury to the navigation of the river.”
Is this opinion well founded ? Is it based upon such reasonable considerations, and upon such facts, as to entitle it to the weight of evidence which ought to influence the judgment of the court and govern its decision.
*550 It is important to notice that these witnesses speak of the “ current of the river,” the “line of the river,” the “ current of the stream,” and the “course of the river,” as synonymous.
The “course of the river” is a line parallel with its banks. The “ current of the stream ” will vary from the general “course of the river,” depending upon a variety of circumstances. Short bends in the river will drive the current diagonally from one bank to the opposite bank. Exposure to the winds on one side, and the protection afforded by high banks on the other, will produce the same effect. The character of the bed of the river must necessarily greatly affect its current. The map exhibited in this case illustrates this. The channel of the river, its current, and its general course, are all in different directions; and if the map is to be relied on it shows conclusively that no draw could be constructed at right angles with any two of them.
Benjamin B. Aycrigg, a witness on behalf of the complainants, gives us the results of his observation and experiments. The position of the draw is south, forty-six degrees forty minutes west; the direction of the current is south, twenty-five degrees west; but this was fixed with some uncertainty at a low tide, and by an experiment not very satisfactory. The general course of the river is south, twenty-nine degrees west. The channel, for the distance of half a mile in the ^vicinity of the bridge, varies very considerably from the general course of the river, and from the current, as indicated by the experiment made by Mr. Aycrigg.
It is manifest from these observations and experiments, that it is impossible to place the draw in a line at right angles with the current and course of the river. As the witnesses treat “the course of the river” and “the current of the stream ” as the same, and as the bridge cannot be placed at right angles with both, their opinion as to what is the proper position for the draw, is very uncertain.
Keasler thinks the draw should be “ in a line with the current and course of the river.”
Pettit, that it should be in a line with the river and the *551 current of the river, and “ the draw not being so is the greatest obstruction to the navigation of the river that could be conceived or imagined.” These witnesses require impossibilities.
It was the opinion of one of the complainant’s counsel, on the argument, that it was more important to have the draw at right angles with the general course of the river, than at right angles with the current, and yet the complaint in the bill is that it is not at right angles with the current.
But on what do the witnesses found the opinions they have advanced ? They are navigators, and have been engaged as such on this river for a number of years. Are their opinions mere matters of speculation ? What has been the teaching of their experience ?
Eor the last eighteen years there has been a draw on this very bridge. Its position, as to the current and course of the river, is precisely similar to the one in contemplation. For a portion of the time it has been ten feet narrower, and the residue of the time nearly twenty feet narrower than the one proposed. Its position has been so near the west bank of the river as to require fenders to protect boats passing through from being driven against the adjoining bank.
The witnesses of the complainants, who must of necessity have passed frequently through the present draw, in order to reach Acquackanonck, the point to which they were navigating, could tell us with certainty what difficulties must needs be encountered with a draw in such a position. What effect has the present draw' had for the last eighteen years on the navigation of the river ? How have vessels in passing through been affected by the current crossing diagonally? How do actual experience and daily experiments correspond with (he opinion of the witness who says, “that the passage through the contemplated draw will be dangerous and hazardous, and under certain and frequent circumstances, such as freshets and certain winds, impracticable without sustaining serious injury ?” Such cannot be the consequences as to the contemplated draw, so much more favorable in every respect *552 both as to location and dimensions, unless they have been experienced in the present draw.
It'may be said that the opinions advanced are the results of experience. The witnesses do not say so. They express them as mere speculative opinions. If "their opinions are correct, they might have proved them. Facts might have been and ought to have been substituted for opinions. A reference to the dangers and difficulties encountered at the present draw ; to the disasters that must have been frequent if their opinions are correct; to facts, as to the effect produced by the current upon vessels passing it — would be more reliable than the mere opinions of a hundred witnesses.
The present draw is a test of the'most satisfactory and conclusive kind, as to the effect of a draw placed at right angles with the bridge.
What does that test prove ? It ought to govern us.
Silas D. Canfield, a witness of the defendants, was the counsel who appeared on behalf of the navigators, to procure the act of the 24th of February, 1843. He says: “ The principal object they had in view was to compel the widening of the draw of bridges on said river ; that there was an objection to the draw on the railroad bridge at Acquackanonck being so near the bank, and it was then deemed best for the purposes of navigation that the draw should be in the middle of the river, but the great object was to have the draws widened, and no objection was made to the draw being made at right angles to the bridge.”
Philip Van Bussum, another witness, says : “ That he has known the railroad from Paterson to Jersey City ever since they commenced building it; and has been in the employ of the Paterson and Hudson Biver Eailroad Company for about, eighteen years; that the railroad bridge erected at Acquackanonck was built in 1832 or 1833, and that the draw in said bridge, as first made, was at the same place as it now is, except that it has been widened; that the bridge crosses the river at that place diagonally, and that the draw was built at right angles to the bridge; that it was built near the Passaic shore; that he worked on the bridge when the draw was *553 widened, and helped to drive the piles; that he has never heard any complaint of the draw except that it was too near the shore, and the company built a fender to keep the boats from running on the shore; that he never heard any complaint of the angle at which the draw was made in the river ; that he has been all the time in the employ of the company, engaged in the repairs of the road and bridges, and for the last three years has had the entire charge of the bridges, and from his position in the company he thinks he would naturally hear of any complaints against the draw; that at the time of the application to the legislature to compel the widening the draws of bridges over the Passaic, he never heard of any complaint of the angle of' the draw.”
With this evidence, and in the absence of all testimony of inconvenience, even in the present draw, am I not bound to conclude that the opinions of the complainants’ witnesses are proved to be incorrect by this test and experience of eighteen years ?
Can it be doubted that, if the company had attempted to erect a draw in any other position than the present one, it would have been considered an experiment which this court would be bound to prevent ?
But the bill further alleges that the stone piers will be obstructions to the navigation ; that they are unnecessary, either as sides to the draw or as supports for the bridge; and the court is asked to interpose and prevent their erection in the river.
Not a witness ventures the opinion that they are unnecessary or will do any injury to navigation. They are not mentioned or alluded to in auy of the affidavits produced by the complainants.
It may be they are unnecessary; it may be they will greatly obstruct the navigation. But I cannot act upon assumptions. The fact that no allusion is made to these piers by the witnesses examined shows either that the complainants did not consider them of sufficient consequence for serious notice, or that the witnesses were unwilling to say that they were obstructions or were unnecessary.
*554 If an injunction is granted to restrain the erection of the piers, it must be done upon the mere allegations of the complainants as to their injurious tendency. It is reasonable to conclude that the piers will add very much to the safety and permanency of the bridge. It would be assuming a. great responsibility for this court to interfere with their erection, and to compel the defendants to support their bridge by wooden piles.
Upon a careful review of the whole case as it is before me, I have come to the conclusion that the complainants have failed to establish the case presented by their bill.
The injunction is refused, but without costs. The order is made without costs, because the subject matter of the bill is one in which the public is interested, and because I am satisfied that the complainants filed their bill in good faith, and not for the purpose of harassing the defendants. The suit has been conducted with a commendable spirit on both sides, and with a disposition to have the questions involved presented and decided without unnecessary embarrassment.
Potts, J. The bill in this case was filed at the relation of persons interested in the navigation of the Passaic river, in the counties of Bergen and Passaic. The complaint against the defendants is that they propose to alter the position of the draw of the bridge over the Passaic, which crosses jsouth of the town of Acquackanonck, and to place under the same a new set of stone piers near the centre of the river, the draw to be placed between the said stone piers; that the said piers are intended to be each from seven to eight feet broad, and of the width of the bridge, as the same shall be widened to the extent of several feet beyond that of the present bridge; and that they propose to place the said piers diagonally across the river and at right angles with the bridge, and not with the current of the stream; that heretofore there has been no stone piers to the said bridge, but the same is supported by wooden piles and shore abutments of stone; that the placing of the said stone piers would materially impede the navigation of the said *555 river, and not being placed in the line of the current of the river, must render extremely dangerous, if not impracticable, the navigation of the river with the vessels now navigating the same, Ac.; and they say that, by reason of the obstructions in the said river, a short delay in getting through the said draw may, and no doubt often will occasion a much longer hindrance in preventing vessels from passing the said obstructions at the high tide, and that the stone piers will, of necessity, prevent all vessels coming into the draw from having the advantage of the wind to carry them through, which is essential to their progress, and will necessarily produce eddies in the wind; and that it seems to the relators that it will not be in the power of the steam towboat (which one of them is building) to tow any vessel through the said draw, which is designed to constitute a part of its regular business. And the bill therefore prays an injunction, Ac.
Appended to the bill are several affidavits, besides that of the relators.
Zaehariah Keasler testifies that he is the master of a vessel; has been engaged in boating on the Passaic river upwards of twenty years; that he has been master of a vessel some fifteen years last past; that he has examined the works in progress of erection for a draw in the railroad bridge across the Passaic river immediately below Acquaekauonck ; that the position of the draw being diagonal to the current, and not in the line of the stream, will make the passage of vessels through the said draw difficult and dangerous at most times; that, in time of freshets, which are of frequent occurrence, and with certain winds, the passage will be impracticable.
Thomas Pettit, another master of a vessel trading on the Passaic, says — “ The location of that draw being at right angles with the line of the bridge, and consequently crossways with the current and line of said river, will make the passage through said draw dangerous and hazardous at all times, and under certain and frequent circumstances, such as freshets and certain winds, impracticable, without sus *556 taining serious damage. The line of the draw should be in a line with the river and the current of the river, and the fact of its present construction being placed as above stated, I consider the greatest obstruction to the navigation of said river that can be conceived or imagined, and entirely unnecessary.”
Henry Crawford, also the master of a vessel running on the river, says — “ The placing of the said draw in the middle of the bridge and said river, at right angles with the line of the bridge, and consequently the line of said draw for the passage of vessels across the line of current of said river, would be not only a very serious obstruction, but, in many respects, ruinous to the navigation of said river, dangerous and hazardous for vessels to pass at all times and under favorable circumstances ; and when the water is high, under the influence of freshets, which we are subject to very frequently throughout every season, and when the current, by means of such freshets, is running at an increased rate of rapidity,, and very often for several days in succession, it would be, to a very great extent, impracticable and decidedly imprudent to attempt a passage through said draw, under any circumstances.”
A map is exhibited, showing the course of the river and the position of the bridge and draw, as contemplated to be erected, from which it appears that, although the draw is proposed to be forty-five feet in width, yet, as the bridge crosses the river diagonally, and the draw is tó be at right angles with the bridge, it affords but about twenty-four feet six inches clear width, to a boat keeping the course of the river as indicated by its banks.
This is substantially the case made by the relators.
The defendants, on the other hand, read affidavits to show that, ever since the bridge was originally erected in 1'832 or 1833, the draw has been at right angles with the bridge, and much nearer the shore, and of less dimensions; that they never heard any complaints of the old draw, except that it was too near the shore; and that, taking the line of the deepest water in the river as indicating the course of *557 the current, the proposed draw will be in a line with the actual current of the river.
It appears on the part of the complainants, then — First. That the defendants have erected their bridge in a diagonal line across the Passaic river, and propose to construct the piers for their new draw at right angles with the bridge. Second. That the place where the bridge crosses is below the head of navigation. And, Third.. That, in the opinion of the witnesses most intimately acquainted with the navigation, the proposed mode of constructing the piers and draw will seriously obstruct the navigation. And the object sought by the relators is to obtain a temporary injunction to restrain the company from proceeding until the question can be fully inquired into and satisfactorily settled.
In the first place, let us see what are the terms and extent of the legislative grant to the defendants, under which they claim the right to construct and maintain this bridge and draw.
By the thirteenth section of the charter of the company, (1 Har. Comp. 324,) they are authorized to build and maintain, on the rivers Passaic and Hackensack, wharves, piers, bridges, <&c., and they are to keep the same properly lighted, and cause to be kept at the bridge over the Hackensack a careful person to open the draw for the free passage of vessels with standing masts. The seventh section of the act had already provided that they might cross the Hackensach river upon or adjoining the bridge belonging to the Now Barbadoes Toll Bridge Company, with their consent; but if such consent could not be obtained, then as near the said bridge as practicable, with a draw in a line and corresponding with the present one, and of equal or greater width.
It seems that the company did not propose, at the time they obtained the charter, to cross the Passaic below tide water, and therefore no provision was made for a draw in that bridge, but the proposed route having been changed by a supplement of the 18th November, 1831, making it necessary to cross that river below tide, the provisions and requisitions of the thirteenth section of the original charter *558 were made applicable as well to the bridge to be constructed over the Passaic as to that over the Hackensack, and, at the same time, more particular provisions were made in reference to the Hackensack bridge, which it is unnecessary here to notice.
Subsequently, in 1842, (Pamp. L. 139,) an act was passed for the better protection of the navigation of the Passaie river, which was repealed and supplied by another act passed in 1843. Pamp. L. 117. This last act directed “ that each and every bridge or viaduct hereafter to be erected over the Passaic river, between the head of navigation and Newark bay, shall be so constructed as to contain a draw for the free passage of vessels navigating the said river, the opening of which draw shall be at least thirty-five feet wide in the narrowest part, and shall be placed in such position as to do the. least possible injury to the navigation thereofand “ that every bridge now erected over said river, not having a draw at least thirty-five feet wide, shall, by the first day of May next, be so altered as to contain a draw of the dimension and description ” above specified.
It is admitted that the defendants complied with the directions of the act last mentioned, so far as to make their old draw of the width prescribed, and so far acquiesced in it. But whether they had done so or not, there can be no doubt that the act is binding upon the company. It violates no-vested rights granted them by their charter, as originally passed, or by the supplement of 1831. They had no authority, by virtue of those acts, to interfere unnecessarily with the navigation of the river. A grant in general terms-, to an incorporated company, of authority to build a draw bridge over a navigable river, always implies that the bridge shall be so constructed, and the draw so placed, as to do the least possible injury to the navigation. The right'of navigation is a pre-existing public right, and all grants of special privileges are to be construed strictly against the grantees and liberally in favor of the public, and he who claims authority to impair or obstruct this right by legislative grant, *559 must show it hy the clear and explicit terms of the grant itself, or at least by necessary implication. Att’y-General v. Stevens et al., Saxton 383; 4 Mass. R. 145. The act of 1843 only declares what shall be deemed a sufficient width of draw, and prohibits in effect any unnecessary interference wdth the navigation.
I cannot see, therefore, that the grave question, whettier the legislature of a state has the power to authorize an obstruction to be placed in a navigable river within its own limits, is involved in this case. The legislature have exercised no such power. When that question comes up it will be time enough to settle it. The erection of bridges over rivers, with proper draws, so constructed and placed as to do the least possible injury to the navigation has never been held to be a nuisance. The slight, but unavoidable obstruction which such bridges occasion is a necessary evil which must be borne for the sake of the public good, which demands it. It belongs to the same class of inconveniences as those to which the traveling public are everywhere subjected in the crossing of public highways by canals and railroads. The relators do not complain of the bridge or the draw; but only of the position in which the draw is proposed to be placed. Jíor do I understand that any serious complaint is made that the piers are to be of stone, provided the objection as to their position in the river is obviated.
It is clear, then, that the whole extent of the company’s right is to maintain a bridge with a draw at least thirty-five feet wide in the narrowest part, and placed in such position as to do the least possible injury to the navigation of the river. And the complaint is that they are about to construct the piers, not in a line with the course of the river as indicated by its banks, but diagonally across the same, so that they will be at right angles with the line of the bridge; and that placing the piers and draw in the proposed position will render the navigation extremely dangerous, if not impracticable, with the vessels now navigating the river.
Xovy, there is no dispute about the fact that the company do propose to place the piers and the draw of the bridge in *560 the position mentioned; and the whole question in the cause is, whether or not that is the position which will do the least possible injury to the navigation. The complainants allege it is not — the defendants insist it is.
The difficulty in the mind of the Chancellor, and which induced him to deny the injunction prayed for, was, that the case of the relators was based upon opinions rather than facts deduced from actual experience; and that opposed to these opinions evidence was produced, as before mentioned, that the first draw erected by the company near the shore, was constructed in the same diagonal position to the' course of the river as indicated by its banks, as was proposed for the contemplated new draw; that no complaints had been made of that, except that it was too near the shore: and that the position of the new draw, as proposed, would be actually at right angles with the current of the river, as indicated by the bed or deepest channel of the same.
But, with great respect for the j udgment of the learned Chancellor, I think a sufficient case is made for a preliminary injunction.
I know it is said that courts of equity will grant an injunction to restrain a nuisance only in cases where the fact is clearly made out, upon determinate and satisfactory evidence, and that if the evidence be conflicting, and the injury to the public doubtful, that alone will constitute a ground for withholding their extraordinary interposition. 2 Story’s Eq. Jur., § 924. But it is often necessary, in order to ascertain the extent and application of a principle, to look to the cases from which it is derived; and in this instance not one of those cited by Mr. Justice Story bears the slightest analogy to the case now before the court. The Earl of Ripon v. Hobert, 3 Mylne & Keene 169, was a bill to restrain certain parties from using steam-engines in draining low lands under their management by throwing the water into the river Witham. The drainage had been formerly managed by wind-mills, and it was apprehended that the rapid process of the steam-power application would endanger the banks of the river. Voluminous affidavits were *561 taken on both sides, extending to seven sets, and containing the representations of opinions, with the facts or alleged facts and reasons on which they rested, found by skillful professional men as well as other persons chiefly directed to determine the question whether any use that could be made of the engine proposed to be erected would prove detrimental to the banks, &c. And the Chancellor said that in the conflict of opinions in the case it was impossible for any one to tell beforehand whether damage would ensue or not. The defendant was making an untried experiment, and the Chancellor left him to prosecute it at his peril. The anonymous case cited from 1 Vesey, Jr., 140, was an application to restrain the defendant from prosecuting further the digging of a ditch, and the Chancellor did restrain him from proceeding further until he answered. The Att’y-Gen’l v. Doughty, 2 Vesey, Sr., 453, was a bill for an injunction against stopping the complainant’s prospect, and the court said that it was very doubtful whether the bill could be maintained for trial, and at any rate he would not interpose before answer. The Att’y-Gen’l v. Nichol, 16 Vesey 338, was a question of stopping ancient lights, for which an action at law had been commenced, and the court refused to interfere until that suit was tried. The Att’y-Gen’l v. Cleaver, 18 Vesey 211, was a bill to restrain a defendant from manufacturing soap, and a preliminary injunction was granted, but subsequently dissolved on the hearing, as the complainant had sought his remedy at law. And Mack v. Wyatt, 3 Merivale 688, was a bill to restrain defendant from digging near the complainant’s bank, and the injunction granted on the ground that the question as to the right had been established at law. Here are the English cases cited; and they go no further than the perfectly familiar doctrine that equity will not ordinarily interfere in cases of nuisance where the complainant has a perfect remedy at law. Att'y-Gen’l v. N. J. R. R. Co., 2 Green’s Ch. 140.
In regard to public nuisances, says Justice Story, the jurisdiction of courts of equity seems to be of very ancient date, and has been distinctly traced back to the reign of *562 Queen Elizabeth. The jurisdiction is applicable not only to public nuisances, strictly so called, but also to purprestures upon public rights and property, as public rivers, &c. 2 Story’s Eq., § 921. And the State of Pennsylvania v. Wheeling Bridge Co., 13 Howard 518, is a memorable case not only in support of the authority of the court to interfere, but to show the importance of its early exercise, as a preventive remedy, in cases where obstructions to a public navigation are about to be erected, which, when erected, can only be removed at very great expense and sacrifice. Indeed, the case in 2 Green’s Ch. 140, above referred to, goes so far as to hold that, when the obstruction has been completed, the thing.complained of is done, the remedy by injunction, which is in its nature preventive merely, is gone.
Now the defendants here are about to erect stone piers in the middle of the Passaic river to support their draw. It is intended to be a permanent structure and to be erected at great expense. The bridge is a railroad bridge on a line of great and increasing travel. If the position in which it is contemplated to place these piers and this draw is not the one which will do the least possible injury to the navigation, nothing is clearer than that it is of the last importance, even to the defendants, that they should know it now ; and it is scarcely less certain that just in proportion to the expense of the work, the difficulty of removing it after it is finished, and the inconvenience, perhaps danger, to the traveling public, which would ensue from the process of removal, will be the delay and vexatious litigation to which the navigation of the river will be subjected in effecting it.
The object of the relators is to anticipate the mischief by stopping the work in limine. They ask a temporary injunction until the question as to whether this is the right position for the piers and draw can be examined and settled, either by the Chancellor or by a reference to a master, to commissioners, or to a jury.
In the first place, it strikes me as a strong fact in this case that the defendants are about to place this draw in an unusual and unnatural position. The natural position of the *563 piers would be on a parallel line, and the draw at right angles, with the course of the river as indicated by its banks; and it requires no science or experience to determine that however the river may wind about in its bed at very low water, as a general rule when it is high the course of the banks is the surest indication of the course of the stream. The proposed position is that which is most convenient to the bridge company, being at right angles with the bridge, which crosses the river diagonally. If the bridge had crossed the river at right angles, it is hardly probable the company would have thought of placing the draw diagonally.
Then in the second place, not only are the charges of the bill explicit, but they are supported by affidavits conclusively showing what, in the judgments of persons best able to form an opinion, the effect of the proposed erection will be. True, we have only their opinions, but they are the opinions of experts; men thoroughly acquainted with the practical business of navigating this river. Questions of this character must always depend upon such evidence. The proposed piers and draw have no actual existence — there can be no experience in reference to that which has no existence ; and consequently we could not, in the nature of things, have the evidence of facts deduced from experience in support of the complainant’s case. To lay down the rule that such evidence is indispensable, would be to say that no injunction could ever issue to stop a party from erecting an obstruction of this character in a navigable river, because until the thing was done there could be no experience of its effects, and when the thing was done, according to the case in 2 Green’s Ch. 140, it would be too late.
These opinions go to the very point of the question in controversy. If these practical navigators are right, the defendants’ proposed piers and draw would be a nuisance— an invasion of the relators’ rights, and without color of justification under the charter of the railroad company. But the defendants had an opportunity afforded them of meeting this testimony and overcoming or shaking it if they *564 could. They have not done so. Not a single practical navigator was called by them — not a single conflicting opinion adduced of any man having any practical acquaintance with the navigation of this river. A fair inference therefore is, that none such could be had; and if this be so, then the whole mass of practical opinion is against the defendants.
I do not attach much weight to the fact, if it be so, that no complaint was ever made of the position of the old draw, except that it was too near the shore. Its location on one side of the river was complained of, and that location may have been the very reason why the present objection did not apply to it. Here is a new draw proposed in a different location, in the middle of the river, and to be constructed with stone piers — and these considerations I think make it a new question. Nor is it a satisfactory answer to the difficulties suggested by the relators in regard to the diagonal position of the new draw, that the line of deepest water corresponds with it. The principal danger in the navigation by reason of the proposed piers, it is alleged, will be in times of high tide and freshets, and the depth of the channel will not control the course of the current on such occasions, but the stream will pursue the course of the banks.
There is no hardship in this case. The defendants had early notice that their right to place their piers and draw as proposed by them would be contested. The question to be ascertained is, in what position these works should be placed to do the least possible injury to the navigation, and the relators manifest every disposition to speed the cause so as to have the question settled without delay.
I think the order of the Chancellor, refusing the injunction, should be reversed; and that the cause be remitted, to be proceeded on in conformity with the opinion of this court. But I think the injunction asked for should extend no further than to restrain the defendants from erecting their proposed piers and draw in the position proposed by them, *565 until the question whether that is the proper position can be determined.